126 So.2d 637 (1961)
P. J. DUPRE et al.
v.
MAYOR AND BOARD OF ALDERMEN OF the CITY OF HOUMA and The City of Houma.
No. 5166.
Court of Appeal of Louisiana, First Circuit.
January 30, 1961.
*638 Caillouet & Wise, Thibodaux, for appellant.
Elton A. Darsey, Houma, for appellee.
Before ELLIS, LOTTINGER, JONES, HERGET and LANDRY, JJ.
LANDRY, Judge.
The appeal herein is by 7 of 10 original plaintiffs in this matter who hereby seek review of the judgment of the trial court dismissing their joint action to establish the alleged nullity of the Ordinance No. 2388 adopted by the Mayor and Board of Aldermen of the City of Houma on February 27, 1960, extending the territorial limits of the municipality by annexing three separate and distinct areas each contiguous to the City but none contiguous to each other.
Defendants Mayor and Board of Aldermen of the City of Houma and the City of Houma (hereinafter referred to and designated simply as "City") have answered the appeal reurging the exception of no right and cause of action filed against plaintiff P. J. Dupre and not acted upon by the trial court, said exception being predicated on the ground that plaintiff Dupre neither resides in the City of Houma nor owns property in any of the three areas annexed by the ordinance in question.
Four basic grounds of nullity are tendered by plaintiff in support of the contention the ordinance of annexation is unreasonable, discriminatory and arbitrary and, therefore, null and void, said grounds *639 being more specifically stated as follows: (1) Defendant City seeks to annex three separate areas individually contiguous to the existing municipality but noncontiguous to each other upon a single petition and by one ordinance; (2) The Assessor's certificate required by LSA-R.S. 33:172 is defective in that the certificate of F. E. Boudreaux, Assessor, Terrebonne Parish, does not comply with the mandates of said statutory provisions; (3) The boundaries of the areas to be incorporated as well as those of the city as enlarged thereby are not defined and set forth with certainty, definiteness and clarity and, more particularly, that said boundaries are improperly and defectively described resulting in "gaps" or "breaks" therein; and (4) The purported annexation has created irregular boundaries resulting in unreasonable, discriminatory and arbitrary exclusions and inclusions of properties of similar nature in the same vicinity without valid cause or reason therefor.
The record shows the City of Houma is situated in the midst of one of the most rapidly expanding and growing industrial areas of our state. The advent of new industries and developments in the general vicinity has resulted in the establishment of many new residential subdivisions as well as industrial plants and facilities on or near the outskirts of the City thus creating the impression of a municipality far in excess of its actual territorial limits. The governing authorities of the city, being fully cognizant of the problems posed by the conditions mentioned, were desirous of expanding the city limits to provide the advantages of incorporation to the numerous adjoining subdivisions and facilities. In 1957 a program of expansion was conducted which resulted in increasing the size of the municipality to an area of 3.6 square miles and doubling the population so that the former city of 11,000 inhabitants became a community of 22,000 residents. The rate of growth continued to accelerate to such extent the Mayor and Board of Aldermen decided further expansion would again rapidly increase the land area of the city as well as the population thereof and such phenomenally rapid growth could be exploited in an organized effort and program to attract even more commerce and industry to the city and its environs.
With the foregoing considerations in view, the city fathers contemplated annexation of several contiguous areas encompassing an additional land area of approximately 14 square miles. In conformity with the plan and policy thus adopted, meetings were held in numerous subdivisions and other areas contiguous to the then existing municipal limits to determine whether public sentiment therein predominated in favor of or against annexation. These meetings were attended and presided over by the Mayor and other city officials who discussed in detail with those present the advantages and disadvantages of annexation; declared the intentions of the governing body of the City with respect to installation of utilities and maintenance of streets in the areas proposed to be incorporated and to the best of their ability answered all queries posed regarding the effects of the proposed city enlargement. Not wishing to incorporate any area in which a majority of the residents were opposed thereto, the municipal officials decided to conduct an unofficial poll to determine the wishes of the majority in each of the several sectors involved. In keeping with the announced policy of being guided by the wishes of a majority of residents in the various areas, subsequent to the public meetings held in each area, informal petitions were prepared and made available for circulation in the numerous sections to determine whether the majority of the residents thereof (irrespective of whether they were property owners or not) favored or opposed annexation, said informal petitions being supplied equally to proponents or opponents of annexation as requested or desired. The informal petitions thus obtained were then carefully reviewed and *640 examined by representatives or employees of the City who deleted therefrom the names of nonresidents, made allowances for duplications contained therein and thus determined whether the majority of bona fide signatories thereto favored or opposed annexation. The information obtained in this manner indicated that in three areas, namely, Mulberry Heights Subdivision on the southwest boundary of the City, Connely Heights on the northern boundary of the City and East Houma or Grand Caillou area on the eastern extremity of the City, 51% or more of the residents therein desired incorporation and in the remaining sections a majority opposed being taken into the city limits.
It was then proposed to annex the three areas which demonstrated an inclination to be incorporated. Inspection of the Homestead Exemption application records in the three areas desiring to be annexed revealed a total of 945 resident property owners thus requiring a minimum of 237 property owning petitioners as signatories to a petition requesting annexation to fulfill the statutory requirement of 25% of the property owning residents as provided for by LSA-R.S. 33:172. Possessed of this information, the Mayor and Board of Aldermen then caused a single formal petition requesting incorporation of the three areas to be prepared and circulated in the Mulberry Heights Subdivision, Connely Heights Subdivision and Grand Caillou areas for the signatures of resident property owners only. When more than 300 such signatures were affixed to the petition requesting annexation, the petition was considered complete, withdrawn from circulation and presented to the Parish Assessor with the request that he check the names and assessment of the signatories and advise whether 25% in number of resident property owners as well as 25% in assessed value had in fact signed said petition. The Assessor checked the names appearing on the petition against the 1959 Tax Assessment Roll, said roll being the last filed on the date of his certificate, (which incidentally was dated February 15, 1960) and upon ascertaining that 300 of the petitioners were resident property owners as shown on the 1959 Assessment Roll, he then totaled the 1959 assessment of said 300 petitioners. Predicated upon the foregoing investigation of records, the Assessor then issued a certificate dated February 15, 1960, reciting the total assessed value of the three areas to be $2,239,930 and the number of resident property owners therein 945 and further certifying that 300 resident property owners in number and $795,710 in assessed value had signed the petition requesting annexation.
Thereafter on February 27, 1960, the Mayor and Board of Aldermen of said City adopted the controversial ordinance incorporating the three aforesaid areas into the City.
At the outset, we wish to point out that the statutory provision for enlargement of municipal boundaries followed by defendant City in the instant case does not require or contemplate the conduct of a popular election the outcome of which determines and decides the issue of annexation. The statute pursuant to which annexation was accomplished in the case at bar requires only that 25% of the resident property owners in number as well as 25% in assessed value request annexation by signing a formal petition asking to be taken into the municipality following which development the only action necessary to complete annexation is the adoption by the municipality of an ordinance formally annexing the area into the city limits.
With the foregoing in view, we shall proceed to consider appellant's contention the annexation was null and void in that it seeks in one petition an ordinance to absorb three separate areas which though individually and separately contiguous to the City are noncontiguous to each other.
*641 LSA-R.S. 33:172 provides in part as follows:
"No ordinance enlarging the boundaries of a municipality shall be valid unless prior to the adoption thereof a petition has been presented to the governing body of the municipality containing the written assent of twenty-five per cent in number of the resident property owners as well as twenty-five per cent in value of the property within the area proposed to be included in the corporate limits according to the certificate of the parish assessor." (Emphasis supplied.)
Learned counsel for appellants contends the words "within the area proposed to be included in the corporate limits" as used in the foregoing statute indicates legislative intention that only one area may be included in a single petition and ordinance and inclusion of three noncontiguous areas in a single petition violates the spirit as well as the letter of said law. The precise issue thus raised has never before been passed upon by the appellate courts of this state. We are referred by counsel for appellants as well as counsel for appellees to Pyle v. City of Shreveport, 215 La. 257, 40 So.2d 235, in which case the Supreme Court of this state held invalid an ordinance of annexation based on two separate petitions. We observe that in the Pyle case, supra, the Supreme Court expressly refrained from adjudicating the validity of annexing two noncontiguous areas in one ordinance adopted upon a single petition. Counsel for the contending parties each cite cases from other jurisdictions holding both for and against the proposition of annexing two or more areas in a single ordinance. We have read the cited authorities none of which, of course, are controlling in this state. We find the divergent views therein expressed most interesting and persuasive in each instance but must arrive at our own conclusions herein bearing in mind the merits and demerits of the contradictory holdings established by the said authorities.
We find nothing in our own statutes indicative of intention to preclude annexation of two or more noncontiguous areas in a single ordinance and since the Supreme Court has held in the Pyle case that such cannot be accomplished in separate petitions, we presume therefrom (although we concede the Supreme Court did not expressly so hold) it may be accomplished in a single petition as was done in the case at bar. As pointed out by counsel for defendant it would be impossible to achieve the desired result in three separate but simultaneously effective ordinances based on the single petition involved herein because of the impossibility of properly describing the boundaries of the City as enlarged had separate ordinances been employed. Under such circumstances, each of the three ordinances must (to meet the provisions of the statute) describe not only the territory to be taken in thereby, but also define and set forth the limits of the entire City as changed by the area involved in each section. The difficulty arising therefrom is that each ordinance would have to describe the boundaries as enlarged while neither could include territory embraced within the other two. Under these circumstances, if all three of the ordinances were adopted or if only two were enacted, the final territorial limits of the municipality as thereby extended and enlarged would be erroneously and improperly defined as each ordinance would have excluded areas taken in by the other ordinance or ordinances. In employing one ordinance, however, the separate areas may therein be individually described and the new limits of the municipality, inclusive of the territories added, may therein be set forth so that the boundaries of the municipality as thus enlarged are clearly and accurately set forth with that degree of certainty and precision exacted by the statute.
An obvious danger to be guarded against in a situation wherein multiple areas are annexed in a single ordinance is the possibility of one or more of said areas being annexed without the necessary petitioners *642 in number and assessed value having assented thereto. If such be shown the ordinance, of course, would be null and void. Another unwholesome result to be avoided is the posible inclusion of one area against its will by the simple expedient of the governing body joining a populous area adjacent to the municipality and desiring annexation with a less populated area opposed to annexation to that the former can outvote the latter, the same result being possible whether annexation be attempted by popular election or petition.
Of extreme importance in the case at hand is the fact that appellants have neither contended nor established that a deficiency of petitioners (in either the requisite number or assessed valuation) exists with respect to any area annexed by defendant herein. Moreover, it is neither contended nor shown that either of the two smaller areas were combined with the larger and more heavily populated Grand Caillou area for the purpose of outvoting the other two against their will. Indeed, we are genuinely impressed with the sincerity of the officials of defendant city and the great lengths to which they went in order to establish the intention of the residents of the respective areas annexed.
The Assessor's certificate herein clearly indicates that 25% of the resident property owners of the territories annexed in both number and assessment have in fact signed the petition which is all that is required in the absence of allegation and proof of deficiency therein. Of course, it would be otherwise if it be alleged and shown that either of the separate areas did not assent in accordance with the statutory requirements but we reiterate that such circumstance was neither alleged nor established in the case at bar. In view thereof, the certificate is presumed valid until the contrary be shown.
The sole attack on the Assessor's certificate upon which the ordinance was predicated, is founded on the allegation the certificate was not based on the latest and best information available to the Assessor. More specifically it is contended said official did not take into account changes in ownership occurring since the filing of the last Assessment Roll and he also failed to certify the valuation of those property owners residing within the area whose property has not for some reason been previously assessed. It is of considerable significance, we think, that no objection has been lodged against the form of the certificate nor has the contention been advanced that the petition lacks the signatures of sufficient resident property owners in either number or assessed property valuation. The certificate is assailed solely on the basis of the testimony of the parish assessor, F. E. Boudreaux, who stated he relied primarily upon the Assessment Roll of 1959 since it was the latest Assessment Roll filed at the time of the issuance of the certificate and further that on the date of the certificate his office was then in the process of preparing the 1960 roll. Boudreaux acknowledged that whereas some information on transfers which had taken place since January, 1959, was available to his office by way of data compiled for use in preparing the 1960 roll, he did not consult this source of information as he had checked 300 signatures (considerably more than the minimum of 25% in number and valuation) and whereas he knew there may have been some transfers between January 1, 1959 and February 15, 1960, he was certain that of the 300 thus verified those who actually resided in the areas on the date of the certificate represented more than the required 25% in number and assessed valuation.
The sum and substance of plaintiff's argument is that Boudreaux's testimony shows he failed to comply with the letter of the statute by not using the latest available information as therein prescribed, therefore, the certificate is valueless and the ordinance dependent upon same void because the jurisprudence of this state requires strict compliance with statutory *643 provisions governing annexations by municipalities. Plaintiffs further contend in effect that it is incumbent upon the City to affirmatively establish that the petition contains the required signatures in number and valuation. Barbe v. City of Lake Charles, 216 La. 871, 45 So.2d 62, is confirmatory of the provisions of LSA-R.S. 33:172 in that it declares the Assessor must certify the valuation as of the date of his certificate and in so doing must utilize all available information taking into account transfers since the filing of the last Assessment Roll. In this regard appellants do not contend a check of transfers and ownership between January 1, 1959 and February 15, 1960, would reveal that less than the required signatures were affixed to the petition in either number of amount but that it might do so.
In addition, counsel for appellants maintains that despite the arduousness thereof the Assessor is required to check the name of each resident property owner against the Conveyance Records in order to comply with the aforesaid statutory mandate. We do not agree with counsel for appellants that the degree of compliance demanded of the Assessor necessitates the virtual abstracting of the property of each resident property owner preparatory to issuing the certificate called for. Moreover, in Hider v. Town of Lake Providence, La.App., 91 So.2d 387, it was held that where the certificate of the Assessor declared the requisite petitioners in number and valuation had signed the petition requesting annexation, the court must presume he acted upon full information for if it were otherwise, he could not have executed the certificate. Nothing in the language of the controlling statute warrants holding that failure to check changes in ownership or to estimate and certify the assessed value of property of a present owner which has not been specifically assessed vitiates the certificate and renders null the ordinance of incorporation predicated thereon. The certificate is prima facie proof of what it contains and is presumed valid until its invalidity be established by evidence showing that it fails to contain the necessary signatures in either number or valuation.
Appellants' contention the certificate was hastily prepared overnight is without foundation in the record. The evidence shows that the matter of enlargement of the municipal boundaries was placed before the public on January 13, 1960 through the press and on radio and television. Circulation of the informal petitions herein previously mentioned was immediately commenced and as they were returned the Assessor's office was furnished the names appearing thereon from which he began compiling a list of home owners from his homestead exemption rolls. From the lists made available to him, the Assessor compiled the number of resident property owners and the value of assessments in the three areas ultimately taken into the City. Upon presentation of the formal petition, he checked the names thereon against the data previously compiled and in this manner determined that more than 25% of the resident property owners in number as well as 25% or more in value were signatories to the petition.
Appellants have made no attempt to demonstrate that the certificate fails to contain the necessary signatures in number and valuation. Mr. Boudreaux testified that he checked and certified the valuation according to the assessment of each of the owners who signed the petition; that there was a total of 300 signatories out of an aggregate of 945 resident property owners. The percentages shown on the certificate are .3174 in number and.355 in valuation. There is no indication the result would have been changed had the Assessor proceeded as suggested by appellants. The attack on the certificate on the grounds urged herein is without merit. The trial court found as a fact that the certificate was not defective in which finding we concur. Barbe v. City of Lake Charles, 216 La. 871, 45 So.2d 62.
*644 Relying upon the provisions of LSA-R.S. 33:178 which provides that an ordinance of annexation must define the territories proposed to be annexed with certainty and precision, appellants contend the ordinance in the case at bar is defective in that in three respects the descriptions therein contained are vague, indefinite and incomplete resulting in openings in the boundaries of the areas to be incorporated.
Conceding that such descriptions must be certain and precise, the rule of interpretation applied is stated in Rhyne's Municipal Law, page 29, Sec. 2:29 as follows:
"As a general rule, descriptions sufficient for private deeds are sufficient for describing municipal boundaries. However, in order to give effect to the legislative intent, the same strictness will not necessarily be applied to descriptions affecting municipal boundaries, as in the case of private deeds. In ascertaining the municipal boundaries on the ground, practical location, such as permanent markers and well-defined monuments, will prevail over a conflicting description, unless the markers are so manifestly wrong as to lead to an absurd result."
The description of the East Houma or Grand Caillou area reads in part as follows:
"* * * thence northerly along the west bank of the intracoastal Canal to the westerly extension of the north bank of Honduras Drainage Ditch; thence easterly along the north bank of the Honduras Ditch to the east side of Grand Caillou Road (Louisiana Highway No. 57, formerly 141) * * *." A better understanding of appellants' contention in this regard will be afforded by a brief explanation of the physical conditions upon which it is founded. Honduras Drainage Ditch runs between the Intracoastal Canal on the West and Grand Caillou Road on the East, coursing in an Easterly direction for approximately 4/5ths of its length then turning sharply at a virtual right angle and for the last 1/5th of its distance runs in a Northerly direction to connect with Grand Caillou Road. At the point where it veers from an Easterly to a Northerly direction, it also continues Easterly eventually discharging into Grand Caillou Bayou. Appellants maintain the foregoing description is vague and indefinite because to reach the East side of Grand Caillou Road it is necessary to proceed Easterly along the North bank of the Honduras Drainage Ditch then Northerly at a right angle at the point where it turns to the North to connect with Grand Caillou Road. Because of the turn, plaintiffs contend that a line projected Easterly along the North bank of the ditch will reach Grand Caillou Road only by deviating from the Easterly direction recited in the description and that to follow the description literally would leave an opening of approximately 200 to 250 feet in the boundary of the Grand Caillou sector.
Defendants point out that the Honduras Drainage Ditch does in fact connect the Intracoastal Canal with the Grand Caillou Road and that a line drawn from the Intracoastal Canal Easterly along the North bank of the Honduras Drainage Ditch will in fact connect with the East side of Grand Caillou Road provided one remains on the North bank of Honduras Drainage Ditch and does not cross same. Defendants contend the intent of the aforesaid description was to make the North bank of the Honduras Drainage Ditch the boundary by following a course along the North bank of said ditch coincident with its meanderings.
We believe that the words "thence Easterly along the North bank of the Honduras Drainage Ditch to the East side of the Grand Caillou Road" were intended to mean not merely an Easterly course *645 but an Easterly course along the North bank of the Honduras Drainage Ditch. The intent appears to be to fix a boundary along a well defined monument, namely, an existing drainage ditch, the further intent being to follow the North bank of the aforesaid monument from the Intracoastal Canal to the Grand Caillou Road. Undoubtedly the Honduras Drainage Ditch was described as running in an Easterly direction because as previously stated for 4/5ths of it overall length it runs in an Easterly direction. Although it does for the last 1/5th of its journey take a Northerly course before reaching Grand Caillou Road, we do not consider that this alters or varies what appears to be the obvious intent of the description to follow the Honduras Drainage Ditch its entire length from the Intracoastal Canal to the Grand Caillou Road. When a topographic feature such as a stream or ditch is used as a boundary it is not necessary to indicate its meanderings and turns.
Additionally involved herein is the fact that the alleged error appears in the description of that portion of the boundary of the Grand Caillou area which is contiguous with the existing municipal limits. The ordinance merely adopted for this boundary the description of the former boundary of the City which it abuts. The intent is plain and clear that the new area was to border or abut on the municipality as it existed without overlapping or openings. One of the surest methods by which this result could be achieved was to describe the common boundary as delineated in the last ordinance prescribing the city limits. The fact that the description in the 1957 ordinance (the last previous ordinance establishing the boundaries of the city) has posed no problem to the city administration indicates that the description is sufficiently certain to indicate what property was situated in the former city limits and which persons resided therein.
A portion of the description of the Grand Caillou area is stated in Section 1 of the ordinance as follows:
"thence westerly along the South line of Roberta Grove Subdivision to the West line of the property of Mrs. Hallette B. Cole; thence South along the West property line to the South bank of Bayou Chauvin."
This portion of the description involves two lines, namely, the South line of Roberta Grove Subdivision and its extension and the West line of the Cole property which two lines form an angle. Defendants contend the description omits and is intended to exclude all property East and South of said lines. Plaintiffs maintain the description casts doubt upon whether some three or four lots in Oleander Subdivision, carved by Mrs. Cole out of her property and situated in the apex of the angle formed by said lines, are included or excluded from the area to be annexed. More precisely, plaintiff contends these two lines do not meet or intersect since the South line of Roberta Grove Subdivision strikes first the East line of the lots in Oleander Subdivision and only the westerly projection or extension thereof would connect with the present Western boundary of the Cole property. We wish to point out that this particular boundary would also constitute a portion of the boundary of the City as enlarged and that because of this fact the particular portion of the description with which we are presently concerned is redescribed in Section 2 of the ordinance which sets forth the limits of the City as extended. We note with more than passing interest that in Section 2 this portion of the description reads as follows:
"thence Westerly along the South line of Roberta Grove Subdivision and its Western extension to the West line of the property of Mrs. Hallette B. Cole."
The learned trial judge in his written reasons for judgment filed herein has, we *646 think, properly and capably disposed of plaintiffs' contentions in this respect and we herewith quote his views therein in full:
"The third point at which plaintiffs aver that vagueness and uncertainty taint the Ordinance with nullity is shown on exhibit `P-1' in the area circled in red and marked `No. 4'. The particular part of the description in question is as follows:
"` * * * thence Westerly along the south line of Roberta Grove Subdivision to the West line of the property of Mrs. Hallette B. Cole; * *'
Plaintiffs assert the inaccuracy of said description in their brief as follows:
"Mr. DeFraites pointed out to the Court and so indicated on maps `Plaintiff-1' and `Plaintiff-5', that one cannot proceed along the South line of Roberta Grove Subdivision to the West line of Mrs. Hallette B. Cole, because of the presence of the Oleander Subdivision intervening, * *."
"* * * Mr. DeFraites testified that the description should have read as follows:
"`thence Westerly along the South line of Roberta Grove Subdivision to the East line of Oleander Subdivision and thence Southerly to the Southeast corner of said subdivision, and then Westerly to the West line of the property of Mrs. Hallette B. Cole.'
"and certainly the description could have correctly read as follows:
"`thence westerly along the South line of Roberta Grove Subdivision, and thence westerly along a prolongation of said line to the west line of Oleander Subdivision.'
"The engineer is theoretically correct insofar as the establishment of an ideal boundary line is concerned. However, our problem here is not the establishment of a line, but the determination of whether or not a particular description defines a boundary with certainty and clarity.
"It should be noted that the description complained about is an extract from paragraph 3 of section 1 of the Ordinance, as follows:
"` * * * thence Westerly along the south line of Roberta Grove Subdivision to the West line of the property of Mrs. Hallette B. Cole; * * *'
"It should be further specially noted that an examination of the said Ordinance shows that in section 2 thereof the said description was amplified to read as follows:
"`Thence westerly along the south line of Roberta Grove Subdivision and its westerly extension to the west line of the property of Mrs. Hallette B. Cole; * * *'
"Thus, the description contained in the Ordinance projects the south line of Roberta Grove Subdivision westerly through Oleander Subdivision, and conforms with what plaintiffs say could have been a correct description (supra).
"It is clearly evident that the description in the Ordinance projects the south line of Roberta Grove Subdivision westerly through Oleander Subdivision, as plaintiffs insist it should be. It thus appears that the only difference between the language of the Ordinance and the contention of Plaintiffs is the name of the line at which the westerly projection ends. The Ordinance refers to it as the west line of the Cole property, while the plaintiffs insist that it should be the west line of Oleander Subdivision.
"It seems to us that the important consideration here is the identity of the line, regardless of the name or names by which it might be designated. *647 In the light of the history of the property and all of the surrounding circumstances set forth hereinabove, it is our opinion that the west line of Oleander Subdivision and the west line of the property of Mrs. Hallette B. Cole are identifiable as one and the same line. And it is our view that both the Ordinance and plaintiffs are referring to the same line. While it is true that the language of the Ordinance might have been more precisely correct by designating the line as the west line of Oleander Subdivision because of the geography of the subdivision, instead of the west line of the Cole property, we do not believe that such lack of absolute semantic precision obscures the identity of the line.
"It is our finding that the line is readily identifiable, that the description of boundaries in the Ordinance is complete and certain, and that, consequently, there is no ground for a finding of nullity."
The description of the Connely Subdivision Section sought to be annexed reads in part as follows:
"Beginning at a point where the prolongation of a line drawn 120 feet north of Sixth Street intersects the east bank of the Intracoastal Canal at mean low gulf, thence northerly along the east bank of the Intracoastal Canal to its intersection with the north line of Connely Subdivision Addition * * *"
In the trial court the aforesaid description was assailed on the ground Sixth Street (which runs generally east and west) is not defined to the East of Williams Avenue which courses generally north and south and is intersected by Sixth Street. In this connection plaintiffs maintained the only maps of record indicating Sixth Street and its bearings are maps or plats of Park View and Margaret Place Subdivisions which said sources show Sixth Street as existing only to the West of Williams Avenue. It is shown by plaintiffs' witness DeFraites (a Civil Engineer) that prolongation of the line along a bearing 120 feet north of and parallel to Sixth Street as shown on the map of Park View Subdivision would eventually project through certain public buildings situated to the East of Williams Avenue and ultimately to a point on the East bank of the Intracoastal Canal North of the Connely Subdivision thus leaving an opening in the boundary. On Appeal, however, plaintiffs have apparently abandoned this line of assault for they now contend in brief only that the old city boundary was on the West bank of the Intracoastal Canal and since the aforesaid description commences on the east side thereof there is thus created a gap consisting of the width of the canal itself which is excluded thereby.
The evidence, however, shows Sixth Street is defined and laid out on the ground East of Williams Avenue, the testimony of Mayor Gary being to the effect Sixth Street is graded, shelled and in use on the East side of Williams Avenue. The learned trial judge correctly found the projected line intended by the ordinance was in fact parallel to that section of Sixth Street lying to the East of Williams Avenue and as thus extended would intersect the East bank of the Intracoastal Canal South of the North line of Connely Subdivision leaving no opening in the boundary and, as explained hereinafter, no isolated segment of the canal as contended by plaintiffs.
Plaintiffs' contention the old city boundary lay on the west side of the Intracoastal Canal was neither alleged in their petition nor argued in the court below. It is advanced for the first time in this court and is predicated solely upon the testimony of the Civil Engineer DeFraites. It appears in the nature of an after-thought advanced following the trial *648 court's rejection of the argument that a line prolonged easterly 120 feet north of Sixth Street would project to a point north of the Connely Subdivision area. The best evidence of where the boundary lay would, of course, be the last previous ordinance fixing the city boundaries. It is significant that plaintiffs have failed to introduce said ordinance in evidence. The trial court resolved this issue adversely to plaintiffs' contention, the decision in this regard being predicated upon certain maps of record including, inter alia, Exhibit D-5 which supports the lower court's finding.
It is clear that the description of the Connely Subdivision area to be added as set forth in Section 1, Paragraph 2, of the ordinance contains no gaps or openings and is otherwise certain and precise. In substance, therefore, plaintiffs' attack in this regard is more properly directed against the description of the city boundary as enlarged. On this issue we observe that this particular segment of the enlarged city boundary is set forth in Section 2 of the ordinance as follows:
"* * * Thence southerly along a line drawn 120 feet east of the east line of Suthon Avenue to a line drawn 120 feet north of the north side of Sixth Street; thence easterly along a line drawn 120 feet north of the north side of Sixth Street or a prolongation of said line to its intersection with the east bank of the Intracoastal Canal at mean low gulf; thence northerly along the east bank of the Intracoastal Canal to its intersection with the north line of Connely Subdivision Addition * * *"
As correctly found by the trial court it is evident from the foregoing description that the line in question projects across the Intracoastal Canal from West to East joining with the annexed portion of the Connely Subdivision area thus closing the new boundary.
The contention that arbitrary, unreasonable and discriminatory action and conduct on the part of the city authorities in excluding and including similar properties without valid reason has resulted in irregular boundaries is not supported by the record compiled on the trial of this cause.
It is quite true as plaintiffs suggest that in the Grand Caillou area two rather large tracts of land, namely, one of approximately 100 acres owned by Mrs. Alphonse Cenac and one containing an estimated 130 acres belonging to Mrs. Hallette B. Cole were excluded resulting in indentations or peninsulas surrounded on three sides by properties annexed. The Cenac tract is shown to be open pasture not presently in use while the Cole property consists of a wooded estate with a large residence situated thereon. It is likewise conceded that in this same area similar properties namely, 55 acres owned by Ruby Thibodeaux, 80 acres belonging to George Saadi and a tract of undisclosed acreage listed in the name of Duffy Guidroz were included. The testimony of Mayor Gary is uncontradicted that Mrs. Cenac and Mrs. Cole expressly requested their respective properties to be excluded since neither had any present intention to subdivide or otherwise develop their holdings whereas Thibodeaux, Saadi and Guidroz all requested annexation as they contemplated development of their respective lands and wished to obtain the advantages arising from incorporation thereof. Such action on the part of the city governing authorities appears considerate as opposed to arbitrary or discriminatory.
Pyle v. City of Shreveport, 215 La. 257, 40 So.2d 235, to which we have been referred by plaintiffs is not controlling of the instant matter. Said authority is clearly distinguishable from the case at hand in that in the cited case no reason for an attempted exclusion was shown in the record. The facts of the present case fall within the ruling in Hider v. Town of Lake *649 Providence, La.App., 91 So.2d 387 and cases therein cited to the effect the burden of proof to establish the alleged unreasonableness of an ordinance of annexation rests upon the party asserting such unreasonableness. We heartily agree with the pronouncements in the Hider case, supra, which state the governing authorities of municipalities possess reasonable discretion with respect to the exclusion or inclusion of property in annexation proceedings. So long as there is no abuse of a reasonable exercise of such power the courts are without right or authority to intervene. We find no abuse of such discretionary power herein.
The exception of no right of action filed by defendant City against plaintiff P. J. Dupre is predicated on the contention the record shows he is neither a resident of the City of Houma nor a property owner in one of the areas annexed. In this regard learned counsel for defendant contends the provisions of LSA-R.S. 33:174 stipulate that suits to contest a proposed annexation may be filed only by an "interested citizen of the municipality or of the territory proposed to be annexed", which counsel interprets to mean that a contestant must either reside in the City or own property in the area taken in. The record is clear that whereas said plaintiff neither resides in the City nor owns property in a section to be annexed he is, in fact, a resident of one of said sections, namely, the Grand Caillou area and more specifically that he resides therein on Grand Caillou Road. We believe the statute contemplates that a contest in matters of this kind may be initiated by a resident of an area to be incorporated irrespective of whether or not he is a property owner. A person affected by the outcome of proposed annexation certainly is possessed of an interest therein. Though he be not a property owner, if he resides in the area he, just as well as the property owner residing therein, will be affected at least to the extent he will thereafter become subject to municipal authority which previously exercised no jurisdiction over his activities. Defendants' exception is without merit and will be overruled.
Judgment affirmed.